1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICHAEL LEAL,

               Plaintiff,

      v.

EVERETT PUBLIC SCHOOLS, et al.,

               Defendants.

Case No. 2:14-cv-01762 TSZ

ORDER

THIS MATTER comes before the Court on plaintiff's motion for a preliminary injunction, docket no. 8. This case presents a conflict between the First Amendment's promise of free speech and a school district's interest in adopting policies aimed at maintaining orderly schools and educating our students. Plaintiff is a student who wishes to pass out religious literature to his classmates during the school day. Defendants are the school district and its administrators that have adopted a policy that restricts when and where students may distribute written materials and requires that these materials have been written or produced by a student. Plaintiff disagrees with this policy and has sought a ruling prohibiting defendants from enforcing it. On December 2, 2014, the Court denied plaintiff's motion for a temporary restraining order and deferred ruling

1  on plaintiff's motion for the preliminary injunction pending additional briefing.  Min.

2  Ord. (docket no. 15).  Having considered all the briefs filed in this matter and the

3  argument of counsel at the hearing on January 21, 2015, the Court concludes that plaintiff

4  has not made the requisite showing for a preliminary injunction.  Accordingly, plaintiff's

5  motion is denied.

6  **<u>BACKGROUND</u>**

7      Plaintiff Michael Leal is a senior at Cascade High School in Everett, Washington,

8  which is part of the Everett Public Schools system (the "School District").  Compl.

9  (docket no. 1) ¶ 1.  Plaintiff, who identifies as a member of the Christian faith, wishes to

10 communicate the claims of his faith with his peers on school property during the school

11 day by passing out religious materials.  *Id.* ¶¶ 14–15.  Doing so, however, violates a

12 School District policy.  This policy provides in relevant part, as follows:

13     <u>Procedure</u>

14     Distribution of materials written and/or produced by students shall not cause a
       substantial disruption of school activities or materially interfere with school

15     operations. Students responsible for distribution of materials will be subject to
       corrective action or punishment, including suspension or expulsion, depending on

16     the nature of the disruption or interference resulting from distribution of materials.

       The following guidelines are in effect in each school building:

17
       A.  Materials written and/or produced by students may be distributed before or

18     after the school day at points of entry/exit of school buildings.

19     B.  Students may also seek permission from the school principal or assistant
       principal to distribute materials written and/or produced by students at other times
       and locations.

20
   Heineman Decl. (docket no. 13) Ex. 5.

21
      To date, plaintiff has been disciplined several times for violating this and other

22

23

ORDER - 2

school policies.  Compl. (docket no. 1) ¶¶ 25–28, 33–36.  Plaintiff also alleges that he has

been threatened with expulsion.  *Id.* ¶ 37.  In response, plaintiff filed suit against the

School District and several school administrators under 42 U.S.C. § 1983 on the basis

that defendants have violated his rights to free speech and expression under the First

Amendment.  *Id.* ¶¶ 61–65.

Plaintiff claims that two aspects of the School District's policy are facially

unconstitutional.  In this motion, plaintiff seeks a preliminary injunction enjoining the

School District from (1) restricting the distribution of literature to the school's entrances

and exits before and after school, and (2) requiring that this literature be written or

produced by a student.

## DISCUSSION

### 1. Applicable Standards

#### a. *Preliminary injunction*

To obtain a preliminary injunction, plaintiff must "establish that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Under the Ninth Circuit's sliding scale approach, however, a plaintiff's failure to

establish a likelihood of success on the merits is not fatal to its motion.  *See Alliance for

the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Rather, these factors

are balanced such that a preliminary injunction could be issued where the plaintiff has

raised "serious questions going to the merits," the "balance of hardships that tips sharply

towards the plaintiff," "there is a likelihood of irreparable injury[,] and [] the injunction is in the public interest."  *Id.* at 1135.

### b.   *Facial challenge*

Generally, to succeed on a facial challenge, the challenger must establish that "'no set of circumstances exists under which the Act would be valid.'"  *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  In the context of the First Amendment, however, facial challenges fall within what is known as the overbreadth doctrine.  *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).  The overbreadth doctrine "is an exception to [the] normal rule regarding facial challenges."  *Virginia v. Hicks*, 539 U.S. 113, 118 (2003).  Under this exception, rather than having to establish that a challenged policy has no possible constitutional application, the plaintiff bears the lower burden of showing that "a 'substantial number' of its applications are unconstitutional, 'judged in relation to the [its] plainly legitimate sweep.'"  *Washington State Grange*, 552 U.S. at 450 n.6 (quoting *New York v. Ferber*, 458 U.S. 747, 769–72 (1982)).

### c.   *Content- and viewpoint-neutral limitations on student speech*

The School District's policy imposes restrictions on the permissible time, place, and manner of a student's distribution of written materials on school property.  The parties disagree as to what standard should be applied to determine whether these restrictions are constitutional.  Plaintiff contends that the "substantial disruption" test from *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), should apply.  Defendants argue that *Tinker* is inapplicable to plaintiff's facial

1  challenge of the policy because unlike the present case, *Tinker* addressed a viewpoint-

2  discriminatory policy.

3          In *Tinker*, a group of students in Des Moines, Iowa, decided to protest America's

4  involvement in the escalating conflict in Vietnam by, among other things, wearing black

5  armbands.  *Id*. at 504.  When officials at their school learned of the planned

6  demonstration, they enacted a policy prohibiting the display of black armbands at the

7  school.  *Id.*  The plaintiffs in *Tinker* challenged the school's policy as unconstitutional.

8  *See id*. at 504–05.  The Supreme Court struck down the policy, holding that a restriction

9  of this type could not be upheld absent "facts which might reasonably have led school

10 authorities to forecast substantial disruption of or material interference with school

11 activities."  *Id*. at 514.  In reaching this conclusion, the Court recognized that students do

12 not "shed their constitutional rights to freedom of speech or expression at the

13 schoolhouse gate."  *Id*. at 506.

14         Since *Tinker*, the Supreme Court has declined to apply the "substantial disruption"

15 test in a number of cases.  In *Bethel School District No. 403 v. Fraser*, 478 U.S. 675

16 (1986), the Supreme Court did not apply *Tinker* in upholding the suspension of a student

17 who made "lewd and indecent" comments during a school assembly.  *Id.* at 685.  Two

18 years after *Fraser*, the Supreme Court carved out another exception from *Tinker*, holding

19 in *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260 (1988), that school

20 administrators enjoy greater discretion in restricting student speech where the speech is

21 "school-sponsored."  *Id.* at 272.  In doing so, the Supreme Court applied the forum-based

22 analysis described in *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S.

23

ORDER - 5

37, 47 (1983).  More recently, in *Frederick v. Morse*, 551 U.S. 393 (2007), the Supreme

Court held that a school administrator had not violated the free speech rights of a student

who was disciplined for displaying a banner that read "BONG HiTS 4 JESUS" at a

school event, *id.* at 409–10, because schools may prohibit "speech that can reasonably be

regarded as encouraging illegal drug use," *id.* at 397.

Plaintiff argues that these cases make clear that if speech does not fall within one

of the exceptions recognized by *Fraser*, *Kuhlmeier*, or *Morse*, any restriction must be

struck down unless the school satisfies *Tinker*'s "substantial disruption" standard.  The

Supreme Court's post-*Tinker* jurisprudence fails to support plaintiff's position.  The

Supreme Court has never held that *Tinker* is the appropriate analytical framework for the

consideration of viewpoint-neutral regulations.  Rather, a close reading of these cases

suggests just the opposite.  For instance, in *Fraser*, the Supreme Court explicitly

distinguished *Tinker*, noting that "[u]nlike the sanctions imposed on the students wearing

armbands in *Tinker,* the penalties imposed in this case were unrelated to any political

viewpoint."  *Fraser*, 478 U.S. at 685.  Rather, the Supreme Court held in *Fraser* that

school administrators are not required under the First Amendment to allow student

speech that "would undermine the school's basic educational mission."  *Id.*

Plaintiff further argues that the Ninth Circuit has applied *Tinker* to viewpoint-

neutral policies.  Both of the cases cited by plaintiff for this proposition, however,

concerned viewpoint-based restrictions.  In *Chandler v. McMinnville School District*, 978

F.2d 524 (9th Cir. 1992), the court addressed a principal's demand that several students

remove buttons that expressed support for a teachers' strike because he disagreed with

ORDER - 6

1    the message.  *Id.* at 526.  In *Burch v. Barker*, 861 F.2d 1149 (9th Cir. 1988), the court

2    considered a Renton, Washington, school district policy that required high school

3    students to submit for approval all student written material before it could be distributed

4    at the school.  *Id*. at 1149.  While this policy was held to be unconstitutional, the Ninth

5    Circuit was careful to limit its decision to content- and viewpoint-discriminatory policies,

6    stating that "[o]ur holding is limited to school distribution policies which are content

7    based, and does not pertain to regulations of time, place, and manner of distribution."  *Id.*

8    at 1159.

9         Defendants argue that because *Tinker* addressed only a viewpoint-based

10   restriction, it should have no application to the policy at issue here.  Defendants point to

11   several cases from other circuits where courts have held that where a school adopts a

12   viewpoint-neutral restriction on the time, place, or manner of student speech, *Tinker* does

13   not apply.

14        For example, in *M.A.L. ex rel. M.L. v. Kinsland*, 543 F.3d 841 (6th Cir. 2008), the

15   Sixth Circuit considered a challenge to a policy that prohibited students from passing out

16   literature in the school's hallways.  *Id.* at 843.  The plaintiff contended that *Tinker* should

17   dictate the court's analysis.  *Id.* at 845.  Rejecting this argument, the court stated that

18   "[c]ontrary to [plaintiff]'s arguments, this case is not governed by the heightened

19   'material and substantial interference' standard articulated by the Supreme Court in

20   *Tinker*."  *Id.* at 849.  As the court observed, while "the school officials in *Tinker* sought to

21   silence the student because of the particular viewpoint he expressed" the officials in

22   *M.A.L.* "have merely sought to regulate the time, place, and manner, of [the plaintiff's]

23

ORDER - 7

1  speech, irrespective of its content or his viewpoint." *Id.* Accordingly, the court held that

2  the officials in *M.A.L.* "certainly need not satisfy [*Tinker*'s] demanding standard merely

3  to impose a viewpoint-neutral regulation." *Id*. at 850.

4      The Fourth Circuit came to the same result in *Glover v. Cole*, 762 F.2d 1197 (4th

5  Cir. 1985). In *Glover*, the plaintiff argued that *Tinker*'s "substantial disruption" test

6  should be applied to invalidate a college's policy prohibiting the solicitation of donations

7  and selling literature on campus. *See id*. at 1202. Rejecting this argument, the court

8  stated that "*Tinker* . . . offers no support for plaintiffs' position and, in fact, the

9  differences in that case only highlight the weakness in the present attack." *Id*. As the

10  court explained, "[t]he present dispute is a far cry from *Tinker*. Unlike *Tinker,* here, only

11  a neutral time, place, and manner restriction has been challenged." *Id.* at 1203.

12      It is clear that the Supreme Court has held that different standards should be

13  applied to different types of speech and regulations. *See Morse*, 551 U.S. at 405 ("*Fraser*

14  established that the mode of analysis set forth in *Tinker* is not absolute."). While *Tinker*

15  is appropriately applied to those restrictions aimed at suppressing student expression or a

16  particular viewpoint, a lower standard is demanded where this is not the case.[1] As the

17  Fifth Circuit held in *Canady v. Bossier Parish School Board*, 240 F.3d 437 (5th Cir.

18  _____

19      [1] Other courts have also held that *Tinker* should not apply to content- and viewpoint-neutral
restrictions. *See Littlefield v. Forney Ind. Sch. Dist.,* 108 F. Supp. 2d 681, 691 (N.D. Tex. 2000)

20  *aff'd sub nom. Littlefield v. Forney Indep. Sch. Dist.,* 268 F.3d 275 (5th Cir. 2001); *Isaacs ex. rel.
Isaacs v. Bd. of Educ. of Howard Cnty., Md.,* 40 F. Supp. 2d 335, 337 (D. Md. 1999); *Nelson v.
Moline Sch. Dist. No. 40,* 725 F. Supp. 965, 973 (C.D. Ill. 1989); *Guzick v. Drebus,* 305 F. Supp.

21  472, 479 (N.D. Ohio 1969) *aff'd,* 431 F.2d 594 (6th Cir. 1970); *LoPresti v. Galloway Twp.
Middle Sch.,* 885 A.2d 962, 966–67 (N.J. Super. Ct. Law Div. 2004); *Phoenix Elem. Sch. Dist.*

22  *No. 1 v. Green,* 943 P.2d 836, 838 (Ariz. Ct. App. 1997).

23

2001), where a school policy restricting student expression is viewpoint-neutral, "a level of scrutiny should apply . . . that is higher than the standard in *Kuhlmeier,* but less stringent than the school official's burden in *Tinker.*"  *Id*. at 443.

"Under this approach, *Tinker* is the default rule that applies to suppression of student speech based on its viewpoint."  *Pounds v. Katy Indep. Sch. Dist.,* 517 F. Supp. 2d 901, 914 (S.D. Tex. 2007).  *Tinker* "does not apply, however, when schools regulate speech for reasons unrelated to its viewpoint."  *Id.*  Instead, where a policy is viewpoint-neutral, it "will pass constitutional scrutiny if it furthers an important or substantial government interest; if the interest is unrelated to the suppression of student expression; and if the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest."  *Canady*, 240 F. 3d at 443.

2. **Likelihood of Success on the Merits**

a. *Limitation on time and place of distribution*

Plaintiff challenges the portion of the School District's policy that limits the distribution of materials to before or after the school day at the entrance or exit of the school building.  Because this regulation does not foreclose the ability of students to distribute materials on school property, plaintiff's facial challenge to this restriction is likely to fail.  This aspect of the policy does not cause plaintiff to "shed [his] constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Tinker*, 393 U.S. at 506.  Rather, the policy only establishes a time and place at which students

ORDER - 9

1    may distribute materials in a viewpoint-neutral manner.[2]

2          Several courts have upheld similar time and place restrictions. For instance, in

3    *Morgan v. Plano Independent School District*, 589 F.3d 740 (5th Cir. 2009), the Fifth

4    Circuit considered a facial challenge to a school district policy that permitted the

5    distribution of materials only during the 30 minutes before or after school, at three annual

6    school parties, during recess, and during school hours but only "passively at designated

7    tables." *Id*. at 743. Upholding the restrictions, the court stated that the school district had

8    a "significant legitimate interest that is furthered by these regulations" as they "are aimed

9    at providing a focused learning environment for its students." *Id*. at 747. Specifically,

10   the court held that the school's prohibition on distributing literature in hallways between

11   classes and in the cafeteria was "intended to facilitate the beginning of class without a

12   wait for the distribution of materials," "facilitate the movements of students between

13   classes," and "reduce littering." *Id*. As the court concluded, "[t]his time, place, and

14   manner regulation serves the powerful interests of the school in maintaining order and

15   discipline, essential both to its duty to teach and the protected freedom of its students to

16

17   _____

18   [2] Many of the cases cited by plaintiff in support of his argument that the School District's
     time and place restriction is unconstitutional are factually distinguishable. *See Westfield High*
     *Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 104 (D. Mass. 2003) (concerning a

19   school policy that prohibited the distribution of "non-school curriculum or activity related
     literature of any kind directly to other students on school grounds."); *J.S. ex rel. Smith v. Holly*

20   *Area Sch.*, 749 F. Supp. 2d 614 (E.D. Mich. 2010) (concerning a policy that barred students from
     distributing non-school related material and singled out religious materials for prohibition); *M.B.*

21   *v. Liverpool Cent. Sch. Dist.*, 487 F. Supp. 2d 117, 141 (N.D.N.Y. 2007) (concerning a policy
     that prohibited students from distributing materials directly to one another); *K.A. ex rel. Ayers v.*

22   *Pocono Mountain Sch. Dist.*, 710 F.3d 99, 102–03 (3d Cir. 2013) (concerning a viewpoint-
     discriminatory policy).

23

ORDER - 10

1   speak.  So construed, the very balance simultaneously teaches and protects the student."

2   *Id*. at 748.

3          In *M.A.L.*, the Sixth Circuit reversed the district court's issuance of a preliminary

4   injunction against a school policy that prohibited students from distributing written

5   materials in the school's hallways.  543 F.3d at 843.  According to the court, as long as

6   the restriction was not meant to suppress student speech based on its viewpoint, the rule

7   would be constitutional so long as it is "reasonable in light of the school's interest in the

8   effectiveness of the forum's intended purpose."  *Id.* at 857 (citing *United States v.*

9   *Kokinda*, 497 U.S. 720, 730 (1990)).  Noting that the policy was not viewpoint-based and

10  that the school had afforded the plaintiff other avenues through which he could distribute

11  literature to his classmates, the court upheld the school's prohibition on handbilling in the

12  hallways, stating that such a "minor regulation of [the plaintiff]'s speech is eminently

13  reasonable."  *Id.* at 847.

14         In *Hedges v. Wauconda Community Unit School District No. 118*, 9 F.3d 1295

15  (7th Cir. 1993), the Seventh Circuit considered the constitutionality of a school policy

16  similar to the time and place restriction at issue here.  Specifically, the policy provided

17  that:  "Material shall be distributed between 7:15 a.m. and 7:45 a.m. and 3:15 p.m. and

18  3:45 p.m. from a table to be set up by the school for such purposes.  The table shall be

19  located at or near the main entrance of the building."  *Id.* at 1296.  Upholding this

20  restriction, the court stated that the "time inside [schools] is in most respects strictly

21  regimented" and that "[l]imiting distribution to a designated place is not an inappropriate

22  rule, given the nature of the school and the principal's lawful control over pupils'

23

ORDER - 11

1   behavior within." *Id.* at 1301.

2       Public schools have a legitimate interest in regulating the conduct of their students

3   with regard to distributing materials within the school building during the school day.

4   Accordingly, rules directed at avoiding congestion, tardiness, and littering may justify

5   restrictions on when and where students may hand out literature or materials.  Further,

6   Cascade High School houses a very large student population on an expansive complex

7   that is comprised of multiple buildings, several portable classrooms, and an auto-shop.

8   Given these conditions, a restriction on the distribution of materials that consolidates

9   these activities to a set number of locations during set times is a reasonable means to

10  allow the school's administrators to monitor student conduct.  Absent the power to do so,

11  a school such as Cascade High School may not feasibly, let alone effectively, be able to

12  supervise students who wish to pass out literature at the school.

13      The Court concludes that limiting the distribution of materials to the entrance and

14  exits of the school building either before or after school both achieves the schools goals

15  while providing an adequate opportunity for students to hand out literature to their

16  classmates.  Further, the Court finds no indication that the time and place restriction here

17  is intended to suppress student expression or speech.  As the Fifth Circuit recognized in

18  *Morgan*, such an arrangement effectively balances the interest of the school in

19  maintaining order while protecting the rights of students.  *See* 589 F.3d at 748.

20          **b.  *Requirement that materials have been written or produced by a student***

21      Unlike the School District's time and place restriction, the constitutional question

22  surrounding the School District's policy requiring that materials have been either written

23

ORDER - 12

1   or produced by a student is a much closer question.  This precise issue not only appears to
2   be one of first impression in this Circuit, but the Court has found only one other case,
3   *Hedges*, that has considered the constitutionality of a rule of this type.  *See Hedges*, 9
4   F.3d at 1301–03.  In that case, Judge Easterbrook concluded that such a requirement was
5   a reasonable and legitimate restriction aimed at encouraging students to learn how to
6   better express themselves in their own words.  *See id.* at 1302.  Not surprisingly,
7   defendants urge the Court to adopt Judge Easterbrook's rationale and uphold the
8   requirement.  Conversely, plaintiff argues not only that *Hedges* was wrongly decided, but
9   that the Ninth Circuit has neither adopted nor implicitly endorsed such reasoning.

10          There can be no doubt that the speech at issue in this present motion—handing out
11   flyers of a religious nature—falls within the protections of the First Amendment.  *See,*
12   *e.g., Watchtower Bible & Tract Soc'y v. Vill. of Stratton,* 536 U.S. 150, 160 & n.10
13   (2002).  "It is also common ground, however, that the First Amendment does not
14   guarantee the right to communicate one's views at all times and places or in any manner
15   that may be desired."  *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S.
16   640, 647 (1981).  This is especially true in public schools, where the Supreme Court has
17   recognized that "the constitutional rights of students in public school are not
18   automatically coextensive with the rights of adults in other settings."  *Fraser*, 478 U.S. at
19   682 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 340–42 (1985)).

20          At the outset, the Court cannot deny the initial force of plaintiff's argument that
21   this policy may fail constitutional scrutiny.  This policy would, after all, prevent plaintiff
22   or any other student at Cascade High School from distributing copies of the Constitution

23

ORDER - 13

1    and the very Amendment under which plaintiff has brought this claim.

2          In support of this challenge, plaintiff argues that a review of the Supreme Court's

3    opinions in *Tinker* and its progeny lack any indication that such a restriction would be

4    found to be permissible.  Specifically, plaintiff argues that because the Supreme Court

5    had recognized prior to *Tinker* that passing out religious literature on public streets was

6    protected under the First Amendment, *Tinker*'s assertion that students retain their First

7    Amendment rights must necessarily mean that schools cannot prohibit students from

8    passing out religious literature in school absent a showing of substantial disruption.

9          This argument, however, seeks to separate the Supreme Court's ruling in *Tinker*

10   from its foundational facts:  namely, that *Tinker* involved a viewpoint-based prohibition.

11   Additionally, as the Supreme Court recognized in *Tinker* and in subsequent cases, schools

12   possess "special characteristics" that differentiate them from the public streets and

13   sidewalks in the cases upon which plaintiff relies.  *See Tinker*, 393 U.S. at 506.  In fact,

14   the Supreme Court in *Kuhlmeier* expressly rejected such a notion, stating that "public

15   schools do not possess all of the attributes of streets, parks, and other traditional public

16   forums that 'time out of mind, have been used for purposes of assembly, communicating

17   thoughts between citizens, and discussing public questions.'"  484 U.S. at 267 (quoting

18   *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939)).  As a result, the Court is not

19   persuaded by plaintiff's argument that the Supreme Court has incorporated the

20   handbilling on public street cases cited by plaintiff, such as *Cantwell v. Connecticut*, 310

21   U.S. 296 (1940), and *Murdock v. Pennsylvania*, 319 U.S. 105 (1943), into the public

22   school context.

23

ORDER - 14

1    Further, plaintiff argues that courts that have considered student speech involving

2 written materials have drawn no distinction between materials that were written by

3 students and those that were not.  This, according to plaintiff, indicates that no distinction

4 may be constitutionally drawn.  In support of this argument, plaintiff cites the Supreme

5 Court's decision in *Morse* and the Ninth Circuit's decision in *Burch*.  The Court notes,

6 however, that the distinction between student written and non-student written material

7 was not at issue in those cases; nor was this distinction even discussed.  The fact that the

8 courts in those cases failed to rule on the constitutionality of an issue that was not before

9 them is neither surprising nor significant.

10    In *Hedges*, however, the Seventh Circuit directly considered and ruled on the

11 constitutionality of a policy that required materials to have been written by a student.

12 The rule in *Hedges* provided that where a student wished to hand out more than 10 copies

13 of a written material, that student was "prohibited from distributing written material

14 which is primarily prepared by non-students."  9 F.3d at 1287.  Reversing a ruling from

15 the district court that had invalidated this policy, the Seventh Circuit held that a school

16 could reasonably—and constitutionally—require its students to use their own words

17 when communicating in writing with their peers.  *See id.* at 1301–02.  While the court

18 noted that such a policy would prevent the distribution of  numerous important works, it

19 also acknowledged that the regulation furthered a legitimate governmental interest by

20 advancing the educational mission of the school.  *See id.*  As the court stated:

21    Learning by doing outside of the classroom is an important ingredient of
      education.  Students write the school newspaper; they do not reprint
22    columns by George Will and William Raspberry but may express similar

23

ORDER - 15

1
2
3
4
5
6

> thoughts in their own words.  If pupils at Wauconda send letters to their
> representatives in Congress, we trust that they write their own rather than
> check the boxes of postcards preprinted by interest groups.  Wauconda
> wants to extend this process to the materials students distribute in an effort
> to persuade their classmates.  A school district may conclude that study and
> exposition improve the student, even if it diminishes the persuasive power
> of the result.  Junior high school students are unlikely to be as effective in
> rhetoric as the professional writers political and religious groups engage to
> write leaflets.  Still, hard work and self-expression bring rewards that
> cannot be measured in successful persuasion—rewards that a school
> logically may prefer.

7   *Id.* at 1302.

8       The court also rejected the plaintiff's argument that such a policy must be

9   unconstitutional because people often "adopt the words of others" in the course of their

10   own expression.  *Id.* at 1302.  Just as plaintiff in the present case has argued, the plaintiff

11   in *Hedges* contended that a policy that would bar the distribution of the Constitution

12   cannot possibly withstand scrutiny.  *See id.* at 1302.  The court in *Hedges*, however, was

13   unpersuaded.  Rather, the court stated that while "adopting the expression of others is a

14   form of speech we freely concede . . . [s]chools routinely deny students the ability to

15   express themselves by adopting the words of others."  *Id.*  This is because "[l]earning

16   how to express thoughts in your own words is an essential component of education, in

17   part because exposition is a valuable skill and in part because of the tight link between

18   the thought and its exposition."  *Id.*  Further, "[a] person does not *really* understand an

19   idea until he has experienced the process of translation, organization, and critique that is

20   necessary to put the idea into his own words."  *Id.*

21       In the case at hand, the School District's policy is viewpoint-neutral.  The Court

22   also finds no indication that it was meant to suppress student speech or expression.

23

1   While the Court remains troubled by the fact that the School District's policy would

2   prohibit students from passing out materials such as the Constitution, it agrees with the

3   court in *Hedges* that such a policy may serve an important educational goal and be upheld

4   under the First Amendment.  Accordingly, the Court cannot conclude that plaintiff has

5   demonstrated that he is likely to succeed on the merits.

6         Plaintiff has, however, raised serious questions going to the merits of this claim.

7   Under the Ninth Circuit's sliding scale approach, the Court must therefore determine

8   whether "the balance of hardships tips sharply towards the plaintiff" and "there is a

9   likelihood of irreparable harm and that the injunction is in the public interest."  *See*

10   *Cottrell*, 632 F.3d at 1131.

11      **3.   Irreparable Harm, Balance of Equities, and the Public Interest**

12         In the Ninth Circuit, "the elements of the preliminary injunction test are balanced

13   so that a stronger showing of one element may offset a weaker showing of another."  *Id.*

14   at 1131.  As the court in *Cottrell* explained by way of example, under this approach, "a

15   stronger showing of irreparable harm to plaintiff might offset a lesser showing of

16   likelihood of success on the merits."  *Id.*  Plaintiff has raised serious questions going to

17   the merits but has fallen short of showing a likelihood of success with regard to his

18   challenge of the student written material requirement.  Accordingly, the scale tips such

19   that he must now make a greater showing of irreparable harm, that the balance of

20   hardships is in his favor, and an injunction would be in the public interest.  *See id.*

21         While "[t]he loss of First Amendment freedoms, for even minimal periods of time,

22   unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976),

23

1  it is not clear that the School District's policy violates plaintiff's First Amendment rights.

2  Absent a stronger showing that plaintiff's "First Amendment interests [are] either

3  threatened or in fact . . . impaired," *id.* at 373, such an argument alone cannot carry the

4  day.  Nor is the Court persuaded by plaintiff's argument that this policy deprives him of

5  opportunities to evangelize to his classmates.  Far from barring plaintiff from

6  proselytizing, this policy expressly provides an avenue through which plaintiff may do

7  so.  Plaintiff need only put his religious beliefs into his own words to be permitted to

8  share his convictions in writing with those he encounters at school.

9        The Court disagrees with plaintiff that the school's threat of discipline should

10  plaintiff insist on passing out material tips the balance of hardships in his favor.  Based

11  on the record before it, the Court finds the balance of concerns actually leans towards the

12  School District.  While plaintiff may express his views through written material so long

13  as he or another student writes or produces it, this policy advances a laudable educational

14  goal.

15        Finally, plaintiff argues that the public interest favors an injunction because "[i]t is

16  always in the public's interest to prevent the violation of a party's constitutional rights."

17  Mot. (docket no. 8) at 17 (quoting *J.S. ex rel. Smith*, 749 F. Supp. 2d at 629).  Plaintiff

18  has failed, however, to demonstrate that his constitutional rights have been violated.

19  Further, the Court finds that the public interest would not be furthered by disturbing the

20  School District's policy at this stage in the proceedings given only the mere possibility

21  that plaintiff might ultimately prevail.

22

23

ORDER - 18

1    **<u>CONCLUSION</u>**

2          For the foregoing reasons, plaintiff's motion for a preliminary injunction, docket

3    no. 8, is DENIED.

4
          Dated this 19th day of February, 2015.
5

6

7    _____
     THOMAS S. ZILLY
8    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23